

**SO ORDERED.**

**SIGNED this 13 day of October, 2005.**

_____
                    ROBERT E. NUGENT
        UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PIXIUS COMMUNICATIONS, LLC | ) | Case No. 04-16825 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| PIXIUS COMMUNICATIONS, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 05-5132 |
| | ) | |
| PHIL RANKIN and MOBILCOM PITTSBURG, | ) | |
| INCORPORATED, d/b/a MOBILONE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### MEMORANDUM OPINION

#### I.  Introduction

Plaintiff Pixius Communications, LLC ("Pixius") seeks a preliminary injunction enjoining

1

defendants Phil Rankin and Mobilcom Pittsburgh, Incorporated (cumulatively," Mobilcom") from various species of interference with Pixius's wireless internet operations in southeast Kansas.[1] The Court entered a temporary restraining order (TRO) on Pixius' application on June 30, 2005.[2] Mobilcom sought and received a continuance of the initial setting on the preliminary injunction hearing (July 8, 2005) and the matter was then set for trial on July 19, 2005. On that day, counsel for the parties appeared and announced that they had settled the matter.[3] Thereafter, however, Pixius's counsel contacted the Clerk representing that Mobilcom refused to close the settlement. The Court held a status conference on July 26. The Court set the preliminary injunction for trial on August 2, 2005. In addition, the Court issued an order requiring Mr. Rankin to appear on August 2 and show cause why he should not be held in contempt for violating the TRO.[4]

## II. Jurisdiction

After the hearing on the motion for preliminary injunction, defendant Mobilcom filed a motion to dismiss the adversary proceeding on the ground that this Court lacked subject matter jurisdiction.[5] Before reaching the merits of the application, the Court is obligated to determine its jurisdiction.[6] Mobilcom's motion is grounded on two arguments: first, that the causes of action

---

[1] Dkt. 17.

[2] Dkt. 22.

[3] Dkt. 36.

[4] Dkt. 45.

[5] Dkt. 54.

[6] *See Lemmings v. Second Chance Body Armor, Inc. (In re Second Chance Body Armor, Inc.)*, 328 B.R. 228 (N.D. Okla. 2005) (Plaintiff's motion for remand and abstention and bankruptcy court jurisdiction over removed state court action concerning defective bullet proof vests would be determined before considering the defendants' motion to transfer the removed

2

raised in the complaint are not core proceedings under 28 U.S.C. § 157(b)(2) and, second, if they are non-core, the Court should exercise its discretion and abstain as permitted by 28 U.S.C. § 1334(c).

### A. Pixius Causes of Action

Pixuis's original complaint recited that this Court had core jurisdiction based on § 157(b)(2)(K) which makes a core proceeding any proceeding to determine the degree and extent of a lien on property of the estate.[7] After the injunction hearing, Pixius moved to amend its complaint.[8] The second amended complaint alleges that the proceeding falls into one of two categories of core proceedings: (1) actions concerning the administration of the estate under § 157(b)(2)(A), and (2) orders to turn over property of the estate under § 157(b)(2)(E).[9] Relying on this Court's previous decision in *In re United Methodist Youthville, Inc.,*[10] Mobilcom argues that all of the causes of action raised by Pixius are creatures of state tort or contract law and, accordingly, are matters over which bankruptcy courts would have no jurisdiction under the Supreme Court's *Marathon*[11] decision. In that case, the United States Supreme Court held that Congress' conferring all of the district court's

---

action to the bankruptcy court in Michigan); *See also,* 28 U.S.C. § 157(b)(3) (Bankruptcy courts are charged with determining whether a proceeding is a core proceeding over which it has jurisdiction.).

[7] Dkt. 12.

[8] Dkt. 59.

[9] Dkt. 63.

[10] *United Methodist Youthville, Inc. v. Lutheran Social Services (In re United Methodist Youthville, Inc.),* 289 B.R. 754 (Bankr. D. Kan. 2003).

[11] *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50,102 S.Ct. 2858, 73 L.Ed. 2d 598 (1982) (*"Marathon"*).

3

bankruptcy jurisdiction on the bankruptcy court was a constitutionally impermissible delegation of the judicial power of the United States to Article I judges, who serve without life tenure or salary protection.[12]

### 1.     Turnover under § 157(b)(2)(K)

Pixius pleaded five separate counts including the following causes of action:  tortious interference with Pixius's existing contractual relations (Count I); conversion of Pixius's property and contract rights (Count II); unjust enrichment from conversion and misappropriation of Pixius's proprietary information and trade secrets and interference with Pixius's right to use certain equipment (Count III); declaratory judgment regarding a contract between Pixius and Sequence Wireless (Count IV); and injunctive relief to enjoin interference with Pixius's rights (Count V).[13]  These claims sound in tort and equity.  The Court would characterize these claims primarily as business torts for which Pixius seeks redress by way of damages for economic loss.  It is noteworthy that the claims alleged here are not prepetition claims; the claims are based upon transactions and events that allegedly occurred post-petition.

Of these counts, only Count I pertaining to conversion appears to fit under the rubric of "turnover."  In Count I, the debtor asserts that Mobilcom has converted valuable business assets and retained them for its own use.  The other counts relating to trade secret infringement and seeking

---

[12]  *Id.* at 71-72, 80.

[13]  Dkt. 63.  Pixius previously alleged in its amended complaint a contract claim against defendant Tom Warren for allegedly breaching an employment agreement with Pixius and a claim for misappropriation of trade secrets asserted against defendants Tom Warren and Dean Spears under the Kansas Uniform Trade Secrets Act.  *See* Dkt. 12.  Pursuant to an Order entered August 15, 2005, the Court approved a compromise of Pixius's claims against defendants Warren and Spears and said defendants were dismissed from this adversary proceeding. Dkt. 53.

4

equitable redress in no way relate to the recovery by the estate of its assets. Even the conversion count is a questionable turnover proceeding because of what it seeks. As pleaded in the complaint and proven at both the temporary restraining order hearing and the preliminary injunction trial, Pixius only "owned" a right to use certain equipment under its Purchase Agreement with Sequence and Sequence's obligation to Pixius was to allow that use until such time as Pixius could change the equipment out with newer devices. Thus, Pixius is seeking to vindicate certain contractual rights and not to recover actual converted estate assets.

Bankruptcy courts should exercise extreme caution in the blanket application of the turnover provision in a way that "expand[s] bankruptcy court jurisdiction beyond that permissible under *Marathon*."[14] As Collier's states, "[t]he problem with these cases is that, under their rationale, every action brought by a trustee or debtor in possession to recover money or property could be characterized as a turnover proceeding, effectively eradicating *Marathon*."[15] Pixius's claims here simply are not turnover claims and, as such, do not constitute core proceedings under § 157(b)(2)(K).

### 2. Administration of the Estate under § 157(b)(2)(A).

Pixius's claims are core proceedings under (b)(2)(A) because they pertain to administration of the estate. Mobilcom's blind reliance on *Youthville* to prove otherwise is easily shown to be misplaced. In *Youthville*, the debtor in possession was a foster care provider who sought to collect an account receivable from another foster care provider for services the debtor rendered before its

---

[14] Lawrence P. King, 1 COLLIER ON BANKRUPTCY, ¶ 3.02[3][c], p. 3-43 (15th rev. ed. 2005) (hereafter "Collier").

[15] *Id.*

5

bankruptcy petition was filed.  In that matter, this Court held that an action to collect a pre-petition account receivable is a pure *Marathon*-type contract action and therefore non-core.[16]  The situation here is quite different.

Pixius's interference claims, whether denominated as interference with contractual relations, conversion, unjust enrichment, or misappropriation of trade secrets, are all based upon post-petition events of alleged wrongdoing.[17]  The fact that the adversary proceeding is based almost entirely on post-petition transactions and events is a significant distinction.[18]

> In light of the *Marathon* case, the legislative history surrounding the 1984 jurisdictional provisions and the post-1984 case law, it seems clear that civil proceedings encompassed by section 1334(b)'s "related proceedings" are those whose outcome could conceivably have an effect on the bankruptcy estate and that (1) involve causes of action owned by the debtor that became property of a title 11 estate under section 541 (*as distinguished from postpetition causes of action, i.e., those that come into existence during the pendency of the bankruptcy case*) . . . .[19]

The implication from this emphasized language is that post-petition claims are core proceedings as cases "arising in a case under title 11."[20]

---

[16]  *Youthville,* 289 B.R. at 757.

[17]  Only the declaratory judgment count is based upon a pre-petition contract, seeking an interpretation of the Pixius-Sequence purchase agreement.

[18]  Even a cause of action by the debtor for a post-petition breach of a prepetition contract has been held to be a core proceeding. *See United States Lines, Inc. v. American Steamship Owners Mutual Protection & Indem. Ass'n (In re United States Lines, Inc.)*, 197 F.3d 631 (2nd Cir. 1999).

[19]  Collier, ¶ 3.01[4][c][ii], p. 3-24 (Emphasis added.).

[20]  A core proceeding includes matters "arising under" and "arising in" bankruptcy cases. *See* 28 U.S.C. § 157(b)(1); Collier, ¶ 3.01[4][c][iv], p. 3-31 (Noting that an action to recover a postpetition account and an action for legal malpractice that arose postpetition "arises in the bankruptcy case."); *Maitland v. Mitchell (In re Harris Pine Mills),* 44 F.3d 1431, 1435 (9th Cir. 1995), *cert. denied* 515 U.S. 1131 (1995) (Claims that arise under or in Title 11 are deemed to be core proceedings)

6

Arguments arise as to whether a dispute arising out of transactions with a trustee or debtor in possession gives rise to a core proceeding as opposed to a "related" matter. . . . [T]he better reasoned cases have held that actions on postpetition accounts receivable (indeed, actions based upon any type of postpetition contract with a trustee or debtor in possession) are core; such a cause of action "arises in" the title 11 case, and was not owned by the debtor at the time the title 11 case was commenced.[21]

The Court's study of the case law decisions support its conclusion that the claims asserted here by Pixius for alleged post-petition wrongdoing are claims "arising in" the bankruptcy case and are therefore, core proceedings under § 157(b)(2)(A).[22] Reorganization under chapter 11 would be of little utility if the debtor in possession's competitors could appropriate its trade secrets and interfere with its business interests safe in the knowledge that the debtor had no recourse to the bankruptcy court.

Having concluded that Pixius's claims in the adversary proceeding are predominantly core proceedings, the Court has jurisdiction to hear and decide the interference claims.[23]

---

[21] Collier, ¶ 3.02[5], p. 3-49.

[22] *Nutri/System, Inc. v. Carma, Inc. (In re Nutri/System, Inc.)*, 159 B.R. 725 (E.D. Pa. 1993) (Chapter 11 debtor's adversary proceeding against franchisees for misuse and misappropriation of trademarks, breach of contract, tortious interference with contractual relations, unjust enrichment, unfair competition, false advertising and deceptive trade practices, based upon post-petition conduct, was core proceeding as a matter concerning the administration of the estate.); *Control Center, L.L.C. v. Lauer*, 288 B.R. 269 (M.D. Fla. 2002) (chapter 11 debtor's claim for post-petition conversion of computer and confidential information on computer against employee after employee's termination was "core" as a matter concerning the administration of the estate); *In re Agri-Concrete Products, Inc. v. Fabcor, Inc. (In re Agri-Concrete Products, Inc.),* 153 B.R. 673 (Bankr. M.D. Pa. 1993) (chapter 11 debtor's cause of action for breach of postpetition contract was a core proceeding under § 157(b)(2)(A) and (O)); *Arnold Print Works, Inc. v. Apkin (In re Arnold Print Works, Inc.)*, 815 F.2d 165 (1st Cir. 1987) (Debtor-in-possession's action to collect account receivable arising out of a post-petition contract and as part of debtor's efforts to liquidate estate assets was core proceeding under § 157(b)(2)(A)).

[23] *See In re GWF Investment., Ltd.*, 85 B.R. 771 (Bankr. S.D. Ohio 1988) (Bankruptcy court should not decide adversary proceedings with both core and noncore matters, unless core

7

### 3. Non-core "Related-to" Jurisdiction

To the extent that the declaratory judgment count is non-core, the Court will exercise "related to" jurisdiction over this claim under 28 U.S.C. § 1334(b). That section expressly confers jurisdiction on the district court to hear not only proceedings arising under and arising in a case under Title 11, but also proceedings that are related to cases under Title 11.[24] Even if the declaratory judgment and injunctive relief claims arising out of post-petition conduct that is said to harm a debtor in possession are non-core (which this Court seriously doubts), the Court still has discretion whether or not to abstain from hearing them under § 1334(c)(1).[25]

Here the debtor in possession is attempting to formulate and confirm a chapter 11 plan. The defendants are accused of purloining the debtor's valuable business opportunities. Can there be any doubt that this controversy is related to the pending chapter 11 case? While these issues could certainly be tried to and resolved by another forum, there are few reasons for this Court, after having heard a day's evidence concerning the injunction request and becoming knowledgeable both of the debtor's business as well as its relations with Mobilcom, to delay the reorganization process further by declining to hear the merits of this matter. As noted above, if Mobilcom's conduct impairs the debtor in possession's efforts to reorganize, casting actions arising out of that conduct outside the bankruptcy court's purview strikes at the very heart of this Court's powers to make Chapter 11 work as Congress intended. The allegations concerning Mobilcom's conduct and debtor's demand that it cease are certainly "related to" Pixius' effort to reorganize. The Court will therefore exercise

aspects heavily predominate.).

[24] 28 U.S.C. § 1334(b).

[25] Because there is no evidence that Pixius has commenced an action in state court against Mobilcom, this Court is not required to abstain. *See* 28 U.S.C. § 1334(c)(2).

"related to" jurisdiction over the non-core count.[26]

Based upon the foregoing, Mobilcom's Motion to Dismiss and Motion for Abstention is DENIED. Pursuant to Fed. R. Bankr. P. 7012(a), defendants Rankin and Mobilcom shall have ten (10) days from the date of this Order to serve their answer to Pixius's second amended complaint. The Court will now address the merits of Pixius's request for a preliminary injunction.

### III. Findings of Fact

After hearing the testimony of several witnesses and reviewing a number of exhibits, the Court is ready to rule on Pixius's request for a preliminary injunction under Fed. R. Civ. P. 65,[27] as well as the allegations of contempt against defendant Rankin for violating the temporary restraining order that was entered June 30, 2005. The following are the Court's findings of fact.

Pixius filed a chapter 11 case in this Court on December 14, 2004 and remains a debtor in possession. Pixius is a wireless internet service provider (or "WISP") to rural communities. It has built this business by acquiring start-up WISPs in rural areas and attempting to improve or upgrade their networks. Pixius has networks covering most of the rural parts of the eastern third of Kansas as well as some networks in Minnesota. Jay Maxwell has been the managing member of Pixius since its formation in September of 2000.

On January 28, 2004, Pixius contracted to purchase some of the assets of Sequence Wireless, Inc., a start-up WISP that provided internet and e-mail service to customers in the Pittsburg, Kansas, and Liberal, Missouri, areas. Under the Purchase Agreement signed that day, Pixius was to pay Sequence $10,000 in cash at signing, $125,000 at closing, and $12,500 per month for six months

---

[26] *See* 28 U.S.C. § 157(c)(1) and (2).

[27] Fed. R. Bankr. P. 7065 makes Rule 65 of the Federal Rules of Civil Procedure applicable to adversary proceedings.

after April 15, 2004.[28]  Tom Warren, Sequence's founder and president, was to receive 25,500 membership units in Pixius.  Warren was also to be employed by Pixius in some capacity.

In return for these payments and other considerations, Sequence conveyed to Pixius its list of customers, a list of hardware, all of its rights to bandwidth feeds under telecom contracts, and all of its rights under its tower leases and other agreements.  Pixius agreed to assume all obligations in connection with the contract rights assigned.  Sequence agreed to retain all liabilities associated with a note, security risks run by customers using 802.11(b) protocol wireless, and payment of personal property taxes then due.

Under § 2.4.2(e) of the Purchase Agreement, Sequence was also to retain ownership of certain SmartBridge equipment.[29]  A SmartBridge is a radio-like device that transmits and receives wireless internet transmissions and routes them to a customer's computer. Pixius was granted the exclusive right to use the SmartBridge equipment until such time as it acquired its own equipment to change out.  Pixius intended to exchange all of the SmartBridge equipment for Motorola Canopy transmitters that use a faster wireless protocol.  Under the Purchase Agreement, when the change outs occurred, the "used equipment becomes the property of Sequence."[30]  The Court was initially puzzled by a scheme whereby Sequence *retains* its property interest in equipment subject to what appears to be a license for use by Pixius, but where, by the Purchase Agreement's express terms, the equipment *becomes* Sequence's property when released by Pixius.  The testimony of both Jay Maxwell for Pixius and Tom Warren of Sequence clarifies that the parties intended that Sequence retain its ownership in the SmartBridge equipment and the Court construes the "becomes" language

_____

[28]  Plaintiff's Ex. 5.

[29] Plaintiff's Ex. 5.

[30]  Plaintiff's Ex. 5, ¶ 2.4.2.

to mean that once Pixius was through with the equipment, Sequence would own it clear of Pixius's right to use it.

At the time of the Pixius-Sequence acquisition, the network had about 160 customers. Its principal operations were conducted from an equipment room on the tenth floor of the Besse Hotel in Pittsburg. The Besse Hotel is the highest point in the surrounding area and its owner, Steve Bitner, testified that he has leased its roof and towers to various telecommunication entities and broadcasters for years, including both Rankin/Mobilcom and Sequence.[31] On January 15, 2004, Sequence leased the tenth floor room and the use of a tower for internet transmission.[32] This lease was to run for four years and provided for the "exclusive operation" of internet service from the roof of the Besse Hotel.[33]

Bitner testified that the blank area in the Sequence lease should have been filled in to specify a particular frequency from which Sequence could broadcast its signal and, in fact, some leases made with other entities that were introduced into evidence contain designated frequencies. According to Bitner, he typically grants an exclusive right to broadcast on a particular radio frequency so as to prevent signal bleed-through among his various tenants. Under the Purchase Agreement, Pixius assumed the Sequence lease obligation[34] and Bitner acknowledged the same with

---

[31] *See e.g.,* Defendant's Ex. A, D and E.

[32] Plaintiff's Ex. 4. Bitner had no recollection of this Sequence lease but admitted that he not only signed the lease as lessor, he initialed each page of the lease. This lease contained no reference to a specific frequency for Sequence exclusive internet operations.

[33] *Id.* The lease agreement called for an annual lease payment of $4,800 due in April each year. Pixius paid the April 2004 rental.

[34] Plaintiff's Ex. 5, ¶ 2.4.1.

11

a later billing to Pixius.[35]

As part of its internet business, Sequence owned and used an internet domain name, *SEQW.com*. This website was hosted through Network Solutions, Inc. and registered in Tom Warren's name. Sequence offered e-mail service to its customers but did not host it. This was done by AIT, a third party e-mail hosting service. Tom Warren was also the registered administrator on this account. Under the Purchase Agreement, Pixius did not acquire *SEQW.com*, but in the Additional Covenants portion of the Purchase Agreement, Sequence agreed that registered domains would be "transferred pursuant [sic] for a reasonable amount of time to Pixius for their business use during a reasonable transition at which time the intangibles will revert back to Sequence."[36] Warren and Rankin testified that they believed a period of a few weeks was "reasonable."

When Warren entered Pixius's employ, he signed a confidentiality and non-compete agreement.[37] Under this agreement, Warren committed to keep secret any customer and prospective customer lists. He also agreed that he would not solicit any of Pixius's customers for a year after he left Pixius employ and that if he obtained other employment, he was barred from using or disclosing any confidential information received while employed by Pixius. Because of his prior presence in the Pittsburg area with Sequence, Warren was responsible for maintaining Pixius's network in southeast Kansas.

Warren became disenchanted with Pixius in early 2005 and according to him, Rankin contacted Warren in late February regarding the purchase of the Sequence equipment. Warren began to negotiate with Rankin and his company Mobilcom, a competitor of Pixius. Warren told

---

[35] Plaintiff's Ex. 7.

[36] Plaintiff's Ex. 5, ¶ 8.4.

[37] Plaintiff's Ex. 17.

12

Rankin that Pixius was in bankruptcy, was not supplying him with needed support or resources, and had not fulfilled its obligations to pay Sequence under the Purchase Agreement. According to Warren, he and Rankin felt they could be the "heroes" who saved the Sequence customers' internet access when Pixius finally folded. After some negotiations, Warren agreed to sell to Rankin's company, Mobilcom Pittsburg, Inc., all of the remaining Sequence assets (those not previously sold to Pixius), including the SmartBridge equipment.[38] Warren agreed to work for Rankin's company, Mobilcom Pittsburg, Inc. According to Rankin, only after Warren and Rankin consummated their deal on March 3, 2005 did Warren provide Rankin a copy of the Pixius-Sequence Purchase Agreement.[39] Warren then informed Rankin that he had granted Pixius license to use the SmartBridge equipment and the *SEQW.com* domain name, but that he considered the Purchase Agreement nullified by Pixius's bankruptcy. For his part, Rankin admitted that he read the Purchase Agreement and knew Pixius had the right to use the SmartBridge equipment to service its customers. Despite knowing this, Rankin went ahead with his plan to take Pixius's customers.[40]

As part of Sequence's sale to Mobilcom, Sequence conveyed free and clear of liens and encumbrances all of its remaining equipment as well as the IP addresses for each of the SmartBridges *along with the names of the customers using them*.[41] These were, of course, Pixius's

---

[38] Plaintiff's Ex. 9. At the time Warren executed the Bill of Sale on March 3, 2005 to Mobilcom, he was still employed by Pixius.

[39] According to Warren's version of events, he gave Rankin a copy of the Purchase Agreement prior to entering into the sale to Mobilcom.

[40] Prior to his agreement with Warren to buy the Sequence equipment, Rankin stated that Mobilcom only had two wireless customers.

[41] Pixius's Chief Technology Officer, Jacques Fluker, testified that each Pixius customer is identified by and has a unique IP address. He indicated that by revealing the location of the SmartBridge equipment and the IP addresses, Warren effectively supplied Ranking and Mobilcom with Pixius's customer list.

13

customers at this time. At Rankin's instance, Warren set about changing all of the IP addresses of the SmartBridges. Warren re-wired the equipment at the Besse Hotel and moved the routers and SmartBridge equipment from the tenth floor room where Pixius maintained them to the thirteenth floor. When Warren took these actions, he effectively shut Pixius off from its network customers, but continued to utilize the Pixius feed. Warren also changed the e-mail hosting to Mobilcom and transferred the domain name *SEQW.com* from himself to Mobilcom as the registered owner. Warren apparently was the only person with the passwords and codes to have the capability of making these changes as he had remained the registered owner on the account, even after Pixius's purchase. These actions crippled Pixius's ability to access customer accounts and service the network and customers. In June, Mobilcom billed the old Pixius customers for July service. In this billing, Mobilcom included a letter insert that announced its "expansion into the realm of Wireless Internet" and that "we are the new owners of *SEQW.com*."[42] The letter further stated that "Pixius no longer owns the equipment that currently provides your service."[43] Mobilcom also modified the *SEQW.com* web page to reflect that its mail server had been updated and that service was interrupted, but that Mobilcom would promptly service same and that customers should contact Mobilcom for information.[44]

Bitner learned of Sequence's sale to Pixius in February or March of 2004 when he was directed by Sequence (Tom Warren) to bill Pixius for the 2004 lease payment due under the Bitner-Sequence lease.[45] In a letter to Pixius dated March 17, 2004, Bitner forwarded a statement for the

---

[42] Plaintiff's Ex. 16

[43] *Id.*

[44] Plaintiff's Ex. 13.

[45] *See* Plaintiff's Ex. 4.

April 2004 rent payment, stating "I understand you have purchased the [sic] Sequence Wireless."[46] Nowhere in that letter does Bitner challenge Pixius's right to possession. Pixius paid the rent on April 5, 2004 and Bitner accepted the payment.[47]

Thereafter, in April, 2005, Bitner executed another lease to Mobilcom (at a higher rental) of the Besse Hotel that overlapped with the term of the 2004 Bitner-Sequence lease. The terms of Sequence's 2004 lease from Bitner include a prohibition on assignment or subletting without the landlord's written consent.[48] At the hearing, Bitner testified that he considered the 2004 Sequence lease terminated because Pixius had installed more antennae on the rooftop than he had authorized and because he never consented to Pixius's replacement of Sequence as tenant.[49] Despite the competing leases for the Besse Hotel, Bitner admitted that he billed and accepted the 2005 lease payment from Pixius under the 2004 Sequence lease.

According to the testimony of Jacques Fluker, Pixius's Chief Technology Officer, Mobilcom has located its equipment and sent its signal from the Besse Hotel.[50] This has disrupted Pixius's signal and caused interruption of service to Pixius's customers.

Subsequent to the sale to Mobilcom, Warren informed Rankin of the existence of the non-

---

[46] Plaintiff's Ex. 7.

[47] *Id.*

[48] Plaintiff's Ex. 4. In the bankruptcy case, Pixius obtained an Order extending the time in which to assume or reject unexpired leases of non-residential real property until the confirmation hearing. *See* Dkt. 117 entered March 16, 2005 and 11 U.S.C. § 365(d)(4). It does not appear that Bitner Properties has participated in the bankruptcy case in any manner.

[49] As of the date of hearing, Bitner had taken no legal action to evict Pixius from the Besse Hotel.

[50] Ultimately, the "exclusive" nature of Pixius's rights at the Besse Hotel is of less import to the issue at bar than is Mobilcom's conduct in significantly altering Pixius's infrastructure there.

15

compete agreement. Rankin agreed to "protect" Warren by discontinuing billings to the Pixius customers, but allowing him to work in the background. Warren gave Rankin his cell phone so that calls went directly to Rankin. Eventually, Warren simply quit Rankin's employ and moved to the Branson, Missouri area, leaving Rankin in charge of the WISP. According to Pixius, some 60 SmartBridge customers accounting for approximately $3,500 in monthly revenue, were "transferred" to Mobilcom as a result of this sequence of events.

In his testimony, Warren was forthright in his admission that he transgressed the terms of the non-compete agreement. He believed that Pixius's alleged default on the Purchase Agreement and its bankruptcy entitled him to do so. For his part, Rankin was also forthright in his essential admission that he bought the SmartBridge equipment in hopes of getting Pixius customers with it. Rankin exhibits a low opinion of Pixius's technical and business acumen and considers that Mobilcom serves the customers in a superior fashion. He said that Pixius was not paying its e-mail host, AIT, and that it was not responsive to customer concerns. He further stated that he did everything in his power to keep the customers serviced and the network up and running. He did not dispute that he wrote the revised web page described above, wrote the letter insert accompanying Mobilcom's billing of Pixius customers, directed Warren to change the IP addresses, and generally intended to take and keep Pixius customers. Rankin said that he thought Pixius would soon be out of business and that keeping the customers connected would be a service to them.

Also notable was Rankin's insistence that he was prepared to return the network to Pixius at any time, but that he did not want the service to be interrupted so as to preserve his reputation. According to Pixius personnel, when the IP addresses were changed by Mobilcom, it gained control over the network and Pixius lost the ability to access and service the network and its customers. No evidence was presented that the IP addresses have been changed back or that control over the

16

network has been restored to Pixius. Likewise, because Warren was the registered administrator of the domain name SEQW.com and Rankin became the registered owner of the domain on May 25, 2005, Pixius lacked the ability to access the domain to service the customers and their e-mail accounts because it lacked the passwords and codes to gain access to the domain.

As previously noted, the Court entered an order on June 30, 2005 temporarily restraining Mobilcom and Rankin from interfering with Pixius's internet business ("TRO").[51] In the TRO, six separate classes of conduct were proscribed. They included:

> 1.      Further disclosing or using plaintiff's customer list for any reason other than to pick-up the used equipment after Pixius has notified defendants that it is done using that equipment;
>
> 2.      Interfering with the plaintiff's existing contractual relations with its current customers.
>
> 3.      Further using the domain name *SEQW.com* that the plaintiff has contractual rights to use until Pixius releases the domain name to the defendants;
>
> 4.      Interfering with the SmartBridge equipment that plaintiff has a contractual right to use until such time as Pixius notifies defendants that it is done using the equipment;
>
> 5.      Interfering with plaintiff's exclusive use of the cell towers and/or roof-top locations that plaintiff has a contractual right to use; and
>
> 6.      Interfering with plaintiff's right to provide customer service through the domain name *SEQW.com*.

The Court also ordered Mobilcom and Rankin to set over the registration rights for the domain name *SEQW.com* to Pixius pending further order of the Court.

In Pixius's motion for an order to show cause why Rankin should not be held in contempt and the affidavit of contempt,[52] Pixius alleged that the defendants have continued to contact and bill

---

[51] Dkt. 22.

[52] Dkt. 43.

Pixius customers as Mobilcom customers after June 30 and have interfered with Pixius's customer relations by telling customers that the internet provider service problems were attributable to Pixius and by interfering with Pixius's ability to service its customers. Pixius also alleges that Mobilcom continued to use the SmartBridge equipment and the cell towers or rooftop locations leased by Pixius in violation of the TRO.

Rankin freely admitted that he had ongoing contact with several Pixius customers after the TRO was entered, mostly for purposes of rendering service or technical support at the customers' request. He denies that he has sent any Mobilcom billings to Pixius customers after June or the entry of the TRO and contends that he has inactivated all customers in the billing system. Rankin also admitted that he continued to feed signals from the Besse Hotel to other towers and to customers, but did so to prevent interruption in internet and e-mail service to customers. He continues to have control over the SmartBridge equipment. There appears to be no question that he responded to service calls on SmartBridge equipment and continued to transmit and receive from SmartBridge equipment. He did promptly act with regard to the domain name *SEQW.com* by taking the web page down immediately upon entry of the TRO.[53] The site was returned to Pixius in July and after Network Solutions contacted Pixius, it was restored as the registered owner of the domain *SEQW.com*. The IP addresses have not been changed back so Pixius still has no access to service its customers.

### IV. Analysis

The Court first addresses Pixius's application for a preliminary injunction before turning its attention to the contempt matter.

### A. Preliminary Injunction

---

[53] Plaintiff's Ex. 14.

In *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*[54], the Tenth Circuit Court of Appeals recited the standards required to obtain a preliminary injunction. Pixius must establish four factors: (1) that it will suffer irreparable harm if the injunction is not granted; (2) that the injury to Pixius outweighs the harm caused to Mobilcom if the injunction issues; (3) that the injunction is not adverse to the public interest; and (4) that Pixius has a substantial likelihood of success on the merits of its case.[55] The irreparable harm requirement is the single most important requirement for the issuance of a preliminary injunction. Finally, Pixius's right to a preliminary injunction must be clear and unequivocal.[56] The Court now analyzes the evidence and findings of fact in light of these four factors and the requisite proof.

### 1.    Will Pixius Suffer Irreparable Injury if Mobilcom is Not Enjoined?

Rankin and Mobilcom readily concede that they knew, and in fact intended, that their actions would result in appropriating Pixius's customers. By using the SmartBridge equipment, changing out the IP addresses, and transferring the domain name to Mobilcom, they knew that Pixius's ability to service its internet and e-mail customers would be cut off. Predictably, the disruption in service and then the inability of Pixius to access and service its customers resulted in angry and dissatisfied customers, leaving them ripe for the picking by Mobilcom. Both Pixius and Mobilcom witnesses testified that customer service and reputation were key to a WISP growing its customer base. The evidence established Pixius's loss of at least 35 customers and harm to its reputation as a WISP. There is significant risk that Pixius will be unable to regain those customers if Mobilcom and Rankin

---

[54] 356 F.3d 1256 (10th Cir. 2004) (Dominion sought preliminary injunction to enjoin Echostar from breaching lease exclusivity clause by transmitting Christian television programming from its satellite using transponders leased to Echostar).

[55] *Id.* at 1260-61.

[56] *Id.*

19

are not enjoined from using the SmartBridge equipment and the domain name, changing the IP addresses, and preventing Pixius access to service its customers. In addition, there is a significant risk that Pixius will be unable to overcome harm to its reputation as a WISP in southeast Kansas if it continues to be denied access to its network and the ability to service customers. Pixius will likely end up losing its ability to grow in southeast Kansas and expand its presence in the wireless internet market without returning the status quo. These are harms to Pixius that cannot be measured or compensated after the fact, but are certainly not speculative.[57]

The factors required to support a finding of irreparable harm are present in this case.

> From this litany of cases, we glean the general lesson that while irreparable harm is frequently found upon the breach of an exclusivity provision, that finding does not rest solely on the breach of the agreement and the resulting loss of exclusivity rights. Rather, the irreparable harm findings are based on such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position.[58]

Moreover, Rankin took the action he did knowing that Pixius was in bankruptcy and that the Sequence assets he bought came saddled with Pixius's license. He took the action with the deliberate design to gain Pixius's customers. As a debtor-in-possession trying to reorganize, Pixius has a critical need to maintain its customer base and stream of revenue. There is a substantial risk that Pixius will be unable to reorganize and emerge from bankruptcy absent the issuance of a preliminary injunction to enjoin Rankin's and Mobilcom's interference with Pixius's operations in

---

[57] *See Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) ("[A]n injury is not speculative simply because it is not certain to occur. An 'irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" [citations omitted.]). *See also, Equifax Services, Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (Irreparable harm found based upon evidence that it was impossible to precisely calculate the amount of damage plaintiff may suffer from loss of customers.).

[58] *Dominion Video,* 356 F.3d at 1264.

southeast Kansas during the pendency of Pixius's bankruptcy.

The Court concludes that Pixius will suffer irreparable harm unless a preliminary injunction issues.

### 2. Does Pixius's Injury Outweigh the Harm to Mobilcom?

The second factor requires the Court to apply a balancing test and consider whether the harm to Pixius if the preliminary injunction does not issue outweighs the harm to Mobilcom if the preliminary injunction does issue. This factor leans heavily in favor of Pixius. Prior to its actions, Mobilcom had a sum total of two wireless internet customers; it was barely in the business. Mobilcom's eventual ownership and use of the SmartBridge equipment and domain name will merely be delayed until Pixius finishes using them and the equipment and domain name reverts back to Mobilcom. Mobilcom ultimately owns the SmartBridge and domain name anyway. It acquired these Sequence assets with knowledge of Pixius's right to use them. Once the right to use the SmartBridge equipment and the domain name come back to Mobilcom, it will be forced to compete with Pixius for the market without the boost that having the customer list gave it. The Court concludes that the harm to Pixius if no injunction is issued clearly outweighs the harm, if any, to Mobilcom if an injunction is issued.

### 3. Is an Injunction Adverse to the Public Interest?

There are sound public policy reasons to support protection of an enterprise's confidential and customer information. What incentive would an entity have to build a business if another could simply steal it? Rankin's "offer" to give the network back suggests he knew he was wrong and that he had gained an unfair advantage in a competitive marketplace. In addition, an injunction furthers the Bankruptcy Code's strong public policy of protecting debtors while they attempt to reorganize their affairs. In the absence of an injunction, Pixius's ability to formulate a viable plan of

21

reorganization without interference to its ongoing business operations is severely hampered. The Court concludes that the issuance of a preliminary injunction *advances* the public interest and is not in any manner adverse.

### 4. Does Pixius have a Substantial Likelihood of Success on the Merits of its Case?

Having found that Pixius has established the first three factors for a preliminary injunction, the Court is left with the remaining "success on the merits" factor. Because the other three requirements are satisfied and tip strongly in its favor, Pixius can satisfy the fourth factor by showing that the issues going to the merits of its claims are so serious, substantial, difficult, and doubtful that the merits are ripe for litigation and deserving of more deliberate investigation.[59]

After reviewing Pixius's interference claims, the Court concludes that there are substantial, difficult and doubtful issues therein that merit a "more deliberate investigation." Likewise, there are serious, substantial, and difficult issues within Pixius's bankruptcy case that merit thorough consideration. Accordingly, this Court concludes that Pixius has satisfied the fourth and final factor for issuance of a preliminary injunction.

For the reasons set forth above, Pixius's application for a preliminary injunction is GRANTED. As previously set forth in the TRO, Rankin and Mobilcom are ENJOINED during the pendency of this proceeding as follows:

a) from further disclosing or using Pixius's customer list for any reason other than to pick-up equipment after Pixius has notified defendants that it is done using the equipment;

b) from interfering with Pixius's existing contractual relations with its current

---

[59] *Greater Yellowstone Coalition*, 321 F.3d at 1261-62.

customers;

c)      from further using the domain name *SEQW.com* that Pixius has contractual rights to use until it releases the domain name back to the defendants;

d)      from interfering with the SmartBridge equipment that Pixius has a contractual right to use until such time as Pixius notifies defendants that it is done using the equipment;

e)      from interfering with Pixius's use of the cell towers and/or roof-top locations that Pixius has a contractual right to use, including the Besse Hotel location; and

f)      from interfering with Pixius's right to provide customer service through the domain name *SEQW.com.*

IT IS FURTHER ORDERED that Rankin and Mobilcom affirmatively act to restore the following rights to Pixius:

a)      the use of registration rights for the domain name *SEQW.com*;

b)      the IP addresses of customers so that Pixius may access the network, domain name, and provide service to its customers;

c)      relinquish control over all network hardware and restore use of the SmartBridge equipment; and

d)      access to Pixius's equipment and hardware (including Sequence equipment that Pixius has been granted the right to use) located at the Besse Hotel and any other tower location that Pixius has a right to use for its internet operations.

IT IS FURTHER ORDERED that the $5,000 bond posted by Pixius in conjunction with the

23

Temporary Restraining Order shall remain in place as the bond for this injunction.[60]

## B. **Contempt**

This brings the Court to the final matter of Rankin's alleged violation of the TRO issued June 30, 2005 and the Court's order directing Rankin to appear and show cause why he should not be adjudged in contempt of the TRO.[61]  This Court has jurisdiction over the contempt proceedings.[62]

To be held in contempt the Court must find that Rankin violated a specific and definite court order, here the TRO, and that he had notice of the TRO.[63]  Pixius must prove by clear and convincing evidence that Rankin violated the TRO.[64]  There is no dispute here that Rankin had notice of the TRO and indeed, took down the webpage *SEQW.com* upon the Court's issuance of the TRO.[65]  It is disputed whether Rankin violated the terms of the TRO *after* June 30, 2005.  The Court finds no evidence that Mobilcom or Rankin billed Pixius customers after the June 20 billings were issued.  Rankin did admit to having some contact with customers regarding service or technical support after the TRO was issued, but he allowed that the contacts were initiated by the customers, not him.  Nonetheless, the evidence indicates that Rankin was responsive to the customer requests

---

[60]   At the preliminary injunction hearing, defendants did not present any evidence with regard to the extent they would be harmed by issuance of the injunction.  Nor have defendants objected to the $5,000 bond set by the Court for the TRO.  Accordingly, the Court concludes that the sum of $5,000 remains sufficient security for damages under Fed. R. Civ. P. 65(c). *See Equifax Services, Inc., supra* at 1362.

[61]   *In re Skinner*, 917 F.2d 444, 447 (10th Cir. 1990) (Bankruptcy courts derive civil contempt powers from 11 U.S.C. § 105).

[62]   *Id.* at 448 (Civil contempt proceedings arising out of core matters are themselves core matters.).

[63]   *In re Lucre Management Group, LLC*, 365 F.3d 874, 875 (10th Cir. 2004).

[64]   *F.T.C. v. Kuykendall*, 371 F.3d 745 (10th Cir. 2004).

[65]   Plaintiff's Ex. 14.

24

and did not refrain from providing service to Pixius's customers as though they were his own. It also appears that Pixius has been restored as the registered owner of the domain *SEQW.com*. However, Rankin and Mobilcom persist in their use of the SmartBridge equipment and their interference with Pixius's ability to service their customers. Rankin and Mobilcom have not restored the IP addresses to Pixius, thereby precluding Pixius from accessing the network and servicing customers. Rankin and Mobilcom also continue to feed signals from the Besse Hotel to other towers and customers, using cell towers and rooftop locations leased by Pixius. Rankin justifies his continued interference with Pixius's right to use the SmartBridge equipment and the Besse Hotel location by his claimed intention to service the customers.

The Court finds that Rankin is in CONTEMPT of the TRO issued June 30, 2005 by his continued dominance and control of the network hardware, including the SmartBridge equipment, the IP addresses of the customers and continued contact with customers for service and technical support. Said conduct violates the TRO in that it interferes with Pixius's customer relations, interferes with Pixius's right to use the SmartBridge equipment, interferes with Pixius's right to use the Besse Hotel location for transmitting signals, and interferes with Pixius's ability to provide service to its customers.

This brings the Court to the matter of an appropriate sanction for Rankin's contempt.[66] Rankin will immediately take all necessary measures to: (1) restore the IP addresses of customers so that Pixius may access the network, domain name, and provide service to its customers; (2) relinquish control over all network hardware and restore use of the SmartBridge equipment to

---

[66] "Civil contempt orders serve either or both of two purposes: (1) to compel or coerce obedience of a court order; and (2) to compensate parties for losses resulting from the contemptor's [sic] non-compliance with a court order." *In re Skinner*, 917 F.2d at 447 n.2 (quoting *Gibons v. Haddad (In re Haddad)*, 68 B.R. 944, 952 (Bankr. D. Mass. 1987).

Pixius;  (3) restore Pixius's right and ability to access its equipment and hardware located at the Besse Hotel; and (4) take any other measure necessary to return Pixius to the status quo prior to Mobilcom's interference.

Rankin shall complete the foregoing actions not later than ten (10) days after the entry of this Order.  Should he fail to do so, Rankin will be assessed a monetary sanction of $117 per diem until he has complied with this Order and completed the foregoing measures,[67] plus reasonable attorneys' fees and expenses incurred by Pixius related to the TRO and contempt matters.

By imposing monetary sanctions only if Rankin fails to comply with this Order,  the Court seeks to coerce Rankin's compliance with the TRO.  These orders and monetary sanctions are imposed for the benefit of Pixius.  By complying with the orders set forth above, Rankin is "able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket."[68]

IT IS SO ORDERED.

# # #

---

[67]  This daily monetary sanction equals 1/30th of $3500 (the estimated monthly lost revenue attributable to lost customers).

[68]  *In re Lucre Management Group, L.L.C.*, *supra* at 876, quoting *International Union, United Mine Workers of America v.  Bagwell*, 512 U.S. 821, 827-828 (1994).

26